The People, *ex rel.* Asa Cutler and others, *vs.* Edgar C. Dibble, county judge of Genesee county.

The act of March 31, 1821, respecting intrusions on indian lands, is not unconstitutional.

The provisions of the constitution and bill of rights, respecting a *trial by jury*, are not applicable to cases of a disturbance of the friendly relations between the state and the indian nations or tribes within the state.

The legislature, in prohibiting, by the act of March 31, 1821, intrusions upon "lands belonging to, or occupied by any nation or tribe of indians," referred to the tracts of land in different parts of the state, which the indians, in their various cessions, still retained, and which were known as reservations.

Where it is admitted, in proceedings before a county judge, under that act, that the persons proceeded against have settled and reside upon land that was a reservation, belonging to the Seneca nation of indians, and that such persons are of a class to which the prohibition in the act applies, this is sufficient, *prima facie*, to give the judge jurisdiction.

If indians have parted with the title to any of their lands, and surrendered the possession to the purchaser, or ceased to occupy such lands, the purchasers may enter, and they will not be subject to the provisions of the act of 1821.

But where indians have always steadily resisted any sale, and have denied the binding obligation of any treaty and grant, as to the reservation occupied by them, and they still occupy the same, under a claim of right, they are entitled to the protection of the act of 1821. Mullett, J., dissented.

The People v. Dibble.

If individuals claim that they have acquired title to the land thus occupied by indians, which claim is denied by the latter, the claimants must resort to their legal remedies, to get possession, and thus try the question of title. They cannot try it before a county judge, on summary proceedings instituted against them, under the act of 1820.

CERTIORARI to the county judge of Genesee county, to review proceedings had before him to remove the relators, as intruders upon indian lands, under the act of March 31, 1821.(a)   The Tonawanda indian reservation was included in the sale to the Ogden company, so called—the pre-emptors—made by the Seneca nation of indians in 1838, and also as modified in 1842. The indians upon this reservation did not consent to the treaties or sale, and have constantly refused to acquiesce in them. The relators purchased, some years since, of Fellows and others, the persons who, by the treaties and cessions of 1838 and 1842, claimed to have acquired the title from the Seneca nation, and entered upon the lands so purchased by them. And the proceedings were instituted by the district attorney of Genesee county, under the act of March 31, 1821, to remove them. The relators set up the title of Fellows and others, and their title from them, and also claimed that the act of 1821 was unconstitutional, and that the judge had no jurisdiction, &c. The county judge, after hearing the proofs and allegations of the

(a) The first section of that act is as follows: "Be it enacted, &c. that it shall be unlawful for any person or persons, other than indians, to settle or reside upon any lands belonging to, or occupied by, any nation or tribe of indians within this state; and that all leases, contracts and agreements, made by any indians, whereby any person or persons, other than indians, shall be permitted to reside, upon such lands, shall be absolutely void; and if any person or persons shall settle or reside on any such lands, contrary to this act, it shall be the duty of any judge of any court of common pleas of the county within which such land shall be situated, on complaint made to him, and on due proof of the fact of such settlement or residence, to issue his warrant under his hand and seal, directed to the sheriff of such county, commanding him, within ten days after the receipt thereof, to remove such person or persons so settling or residing, with his, her, or their families, from such lands; and it shall be the duty of such sheriff accordingly, within the time aforesaid, to remove such person or persons, and for that purpose he shall have and possess the same powers as in the execution of criminal process," &c.   (Laws of 1821, ch. 204, p. 183.   3 R. S. 3d ed. p. 273.)

parties, decided to issue his warrant to remove the relators from the reservation.

*L. Brown* and *J. L. Talcott,* for the relators.

*J. H. Martindale* and *Wakeman & Bryan,* for the defendant.

MARVIN, P. J.   In my opinion, the act of March 31st, 1821, is not unconstitutional.   It is not in conflict with the provisions of the constitution referred to by the counsel for the relators. These provisions, I think, have no application to the case.   At the time this act was passed, there were certain tracts of land in this state owned and occupied by certain nations or tribes of indians, and these lands were known as *reservations,* the indians not having by treaties or otherwise ceded their interest or title.

This law had reference to these reservations.   The language used is, "any lands belonging to or occupied by any nation or tribe of indians in this state."   The indian nations or tribes were the original proprietors ; they had ceded most of their lands, and had ceased to have any claim to them.   They were not citizens of the state, but had governments and laws of their own, a policy of their own, and with which the state did not desire to interfere.   They were regarded in many respects as independent nations, poor and weak, to be sure, and needing necessarily the guardian power of the state to protect them in the enjoyment of the little of the extensive domain that remained to them.   Can it be doubted that the state had the power to say that no man, not an indian, should enter upon these lands, and to provide a summary mode of removing him if he did?   These tracts of land are within the jurisdiction of the state, but they were not, while the indians chose to retain their title, the subject of private property.   The indians were but partially civilized, easily excited, and liable to resort to violence : they were liable to be imposed upon, and, in short, considerations of justice and policy required that the state should interfere and protect the lands of the indians from intrusion.   The

peace of society required this, the danger of strife and blood-shedding prompted to the passage of this and other laws.

But it is said that if this law against intrusion is violated, the party violating must have a trial by jury, especially if he claims to have acquired a title. In my opinion, the provisions in the constitution and *magna carta* and bill of rights are not applicable. There is no analogy between the circumstances and cases for which those provisions were intended, and the circumstances between the citizens of the state and the indians, existing at the time the act was passed touching the lands of the indians and their policy, and the policy of the state towards them. The principles referred to are important in controversies between citizen and citizen touching their rights, and between an individual subject to the criminal law of the state and the state; but they are not applicable to a disturbance of the friendly relations between the state and the indian nations or tribes within the state. Suppose the state was the owner of a township of land, and should enact a law that no person should settle or reside upon the land in that town, and if he did that he should be removed by the warrant of the governor or in any other summary way, would not such a law be constitutional? The state being the owner of the land, and never having sold it or authorized its sale, no one could have any title, and the state, I think, could provide for the immediate and summary removal of all persons settling and residing thereon. The case of the indian reservations is stronger than the case supposed. The indians, recognized as nations or tribes, and with whom it was important for the state to live in harmony, still owned certain lands, the title of which they could not part with except to certain persons and in a manner fixed by constitutions and laws, and the legislature said no person, other than indians, shall settle or reside upon these lands, and if they do they shall be removed summarily. In my opinion this law was, and is, constitutional.

It must appear, undoubtedly, that the intrusion was upon indian lands, that is, lands belonging to or occupied by a nation or

tribe of indians, in order to give the judge jurisdiction. But what, under this statute, was necessary touching the title or occupancy? Was it necessary to prove that a nation or tribe of indians in this state owned or occupied the land? Suppose the land was confessedly outside and away from one of their reservations, would the judge hear evidence of the ownership or occupancy? What state of facts existed when the law of 1821 was enacted? A few small tracts of land remained in the state, which the indians in their various cessions still retained. They have been known as reservations. No one anticipated at that time that these nations or tribes would ever acquire title to any more land in the state. These reservations were known, and their boundaries clearly defined and ascertained, or if not ascertained they could be, by reference to the treaties or cessions, and these reservations were occupied by the indians. What did the legislature refer to and mean by the language, "lands belonging to or occupied by any nation or tribe of indians?" It seems to me that they referred to these well known and well defined reservations, and that the prohibition was intended to apply to them, and to them only, as much as though it had enumerated and specified the reservations, and given their boundaries. These lands were the subject of the act. There had been and has been much discussion as to what kind of title the indians had. I am not going into the question. It has been said that their title was a right to occupy—a right of occupancy—all agree that they had some title, some rights—hence the language in the act, "belonging to or occupied by." This language was intended to embrace whatever title they had to their reservations. If the whole Seneca nation or a tribe should go on a fishing or hunting excursion to the shores of Lake Ontario or into the northern wilderness, and should erect tents and cabins and occupy half a township, and intruders should come among them, I do not suppose that they would be protected by the statute. Such a case would not be within the meaning of the act. We must have regard to facts and circumstances existing when the act was passed, in order to give it its proper construction.

Regarding this statute as referring to those reservations and

The People *v.* Dibble.

the rights of the indians as recognized by the legislature, the only question of fact necessary to give the judge jurisdiction, would be whether any prohibited person had settled or then resided upon those lands. The settlement or residence—the kind of settler or intruder—and the place, i. e. whether over the line upon the reservation, would be questions of fact, and those facts being established, the judge would, *prima facie*, have jurisdiction. Now all these facts are conceded in this case. It is admitted that the settlements were made upon land that was a reservation belonging to the Seneca nation of indians in 1821, and that was occupied by indians belonging to the nation, and that the persons so settling were persons of a class to which the prohibition applied. But it is said that the indian title has been extinguished; that their right of occupancy had ceased; and that the relators had a good title; at any rate, a title that cannot be investigated and tried without a jury, and that therefore they cannot be disturbed by this summary proceeding. It is not claimed that the statute applies to any land not belonging to, or not occupied by, a nation or tribe of indians. If the indians have parted with the title to any of their lands, and surrendered the possession to the purchaser, or ceased to occupy such lands, the purchasers may undoubtedly enter, and they will not be subject to the provisions of the act of 1821.

Assume, in the present case, that Ogden and Fellows, by the grant to them and by the treaties and the subsequent proceedings, have acquired a valid title to the Tonawanda reservation, does it follow, under the admitted facts in this case, that the settlement and residence of the relators as the grantees of O. and F. was not in violation of the act of 1821? Can they, in their proceedings and under the admitted facts, raise and litigate the question of the legal title, before the judge? The Tonawandas were in possession of the reservation, or the land in question, when the relators entered. They were in possession of the reservation when the proceedings were had before the judge. It is said that they were not a nation or tribe of indians, but simply a band, &c. The statute relates to a *nation* or *tribe*. I do not think it was material to inquire by what designation the Tonawandas were known.

VOL. XVIII. 53

They belonged to the Seneca nation of indians, they occupied this small reservation (12,800 acres) as they did in 1821, and as they had occupied for a long time. The statute included them. Now assume that the Seneca nation had the right to sell and dispose of this reservation without the consent of the Tonawandas, and that the nation has made a valid sale, the question recurs, have the purchasers a right to enter and dispossess these indians without due process of law? These indians have always steadily resisted any sale—have denied the binding obligation of the treaty and grant as to the reservation occupied by them; they have been careful to retain the possession and occupancy. Suppose they are in the wrong, and that their title and right to occupy are gone, still, as long as they do occupy, claiming the right to occupy, are they not entitled to the protection of the act of 1821? At common law, one who enters upon land to which he has a right, cannot be ejected by an action brought to recover possession. He could defend his possession by his title. But is this principle applicable to the relation between the state and the indians, or the indians and individuals? The state undertook to protect the indians in the possession of the lands belonging to or *occupied* by them, and prohibited persons from settling or residing upon such lands. Now, it seems to me, that if any person or persons claim that they have acquired title to the land which is still occupied by the indians, who deny the title of the claimants, the latter should resort to their legal remedies to get possession, and thus try the question of title. A controversy arises touching the title to, and right of possession of, certain lands which were a reservation, and which are still *occupied* by the indians; and those who claim the land, enter and commence settlement; has not the case arisen to which the act of 1821 applies?

The object of the law, with various other laws of the state, was to protect the indians, to quiet them and render them secure. It says nothing about forcible entry or forcible detainer. It says nothing about any action by the indians. The law throws the burden of protecting the occupants, upon the state, and not upon the indians. They are to be put to no trouble. The state under-

The People *v.* Dibble.

took, as a matter of duty and policy, to protect the indians from intrusion. They were not to be involved in litigation with the citizens of the state, but the state assumed to control its own citizens, and put them off the indian lands. It was a matter of policy on the part of the state, as well as justice to the indians, to do so. As to the rights of citizens, in controversies between them, the law is left open to them. They are supposed to be capable of protecting their rights by a resort to the courts, and to the due process of law. It seems to me that the policy of the act of 1821 applies to this case. The Tonawanda indians still occupy the Tonawanda reservation, and they claim that they have a right to occupy. They are uneasy; they demand protection; the state has said to them, no person other than indians shall settle or reside upon any lands belonging to, or occupied by you: but the state has not said that the indians should not sell their lands, under certain circumstances, nor has the state said that those who claim that they have purchased, or that those who claim the right to the land or the possession, should not have their actions to try those claims.

In my opinion, the Tonawanda indians were entitled to the protection of the statute ; and those who claim title under the treaty should resort to proceedings, other than sending settlers upon the lands, to get the possession. It is not necessary to inquire what those proceedings should be. The United States have removed indians, who were unwilling to execute their treaties, by military force. I do not suggest that such course is necessary, or that it would be proper in this case, assuming that O. and F. acquired a good title to these lands. But the facts that the nation and state interfere in the matters pertaining to the indians and their lands, show that, even after treaties, the rights acquired are regarded as matters of state. It does not follow that, in this case, all the questions involved may not be tried in our courts ; but until the rights of the parties are settled, it seems to me that those who enter upon the Tonawanda reservation violate the act of 1821, and that they may be summarily removed, and cannot set up and try their title before the county judge.

This act is not in conflict with the law of the United States, nor was it superseded by the treaty, &c.

Bowen, J., and Green, J., concurred.

Mullett, J., dissented.

Proceedings confirmed.

[Genesee General Term, September 4, 1854. *Marvin, Bowen, Mullett* and *Green,* Justices.]